(No. 78886.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SHERRELL TOWNS, Appellant.

*Opinion filed December 19, 1996.—Rehearing denied February 3, 1997.*

454

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and William R. Haine, State's Attorney, of Edwardsville (Barbara E. Preiner, Solicitor General, and Arleen C. Anderson and Steven R. Splitt, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a trial in the circuit court of Madison County, a jury found defendant, Sherrell Towns, guilty of five counts of first degree murder. 720 ILCS 5/9—1(a) (West 1992). That same jury found defendant eligible for the death penalty based on the aggravating factor that he killed two or more individuals. See 720 ILCS 5/9—1(b)(3) (West 1992). It further concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the trial judge sentenced defendant to death on each count. The sentences have been stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603. For the reasons that follow, we affirm both the convictions and the sentences.

## BACKGROUND

This case involves the execution-style murder of five men in Madison, Illinois. The State's primary evidence against defendant came from defendant's own admis-

sions to both his acquaintances and to police and can be summarized as follows. On the evening of November 17, 1993, defendant, who was accompanied by Remon Williams and Michael Coleman, drove his dark green van to the trailer home of David Thompson. Thompson's trailer was widely known in the community as a place where drugs could be purchased. The trailer was surrounded by a chain fence, and its windows were secured with iron bars. Thompson carried the only key to the trailer and had complete control over who entered the premises. In fact, it was his policy to admit only those people whom he knew.

Defendant and his cohorts gained entry to the trailer because Coleman knew Thompson. Defendant and Williams sat in the living room while Coleman went into the kitchen. After a couple of minutes, Coleman called out to someone who was in a back room. When that person came out, defendant, Coleman, and Williams all brandished guns. Defendant had a 9 millimeter pistol, and Coleman and Williams both carried .380-caliber handguns. According to defendant, three other men besides Thompson were in the trailer at the time.

All four of the trailer occupants were then ordered to get down on the floor. One of the men, however, reached for defendant's gun, and defendant shot him in the chest. Although the man "went down," defendant stated that he did not die from the wound because he continued to talk the entire time they were there. Defendant and his accomplices then demanded that the men give them all of their money, and defendant and Coleman searched the trailer. When no money was found, Thompson told them that it was kept by a relative in a neighboring trailer.

Defendant bound two of the men with duct tape and accompanied Coleman and Thompson to the trailer next door. According to defendant, a man, later identified as

Jeff Mosby, responded to their knock on the door. Thompson asked him to get the money, but Mosby "just kind of stood there." Defendant and Coleman pushed their way into the trailer and ordered Mosby to get down on the floor. Instead of complying, Mosby remained standing, with what defendant characterized as a "what's up type look on his face." Defendant also acknowledged that Mosby acted as if he did not really know what they were talking about. Mosby was again told to get down on the floor, and defendant shot him when he remained standing. The subsequent search of Mosby's trailer revealed no money. When defendant and Coleman asked Thompson why there was no money in the trailer, Thompson told them that Mosby's aunt did not trust Mosby with the money because he "smokes dope," and that she must have put it in the trunk of her car.

Upon their return to Thompson's trailer, defendant bound Thompson with duct tape. At that time, defendant, Coleman, and Williams decided to leave. As they started to depart, they saw a car come down the road so they returned to the trailer. Defendant and Williams asked Coleman what he wanted to do because "these guys [knew his] face," but did not know either of them. Coleman indicated to them that they should just leave them alone. But he then changed his mind, saying, "[T]hey know me. Let's do them." Defendant claimed that the four men in Thompson's trailer were then shot by Williams, who used defendant's 9 millimeter pistol. As the three were leaving Thompson's trailer, defendant saw a car pull into Mosby's driveway.

Thirteen-year-old Candice Branch saw defendant and two other men in front of Thompson's trailer while she was walking home from a school program at approximately 10 p.m. on November 17. She heard one of the men say "let's go do it," or "lets go smoke these." Branch became frightened and immediately ran home.

Kimberly Fulton returned to the trailer home she and her children shared with Mosby at approximately 10 p.m. on the day in question. As she walked to her trailer, Fulton noticed three men leave Thompson's trailer. The three men then sped away in a dark green van which had been parked in front of Thompson's trailer. Fulton entered her trailer and found Mosby's body sprawled across the floor. Mosby had been shot once, with the bullet passing through his left arm and into his chest. When Fulton asked her children what had happened, they responded that the "boys next door" had done it. Fulton then went to the trailer next door and saw that the front door was slightly ajar. Fulton returned to her trailer and dialed 911.

When the police arrived, they discovered Cedric Gardner, Thompson's roommate, lying in Thompson's kitchen. Gardner's hands, feet, and mouth had been bound with duct tape, and he had been shot once in the head. Police also found the body of Bedford Jennings, bearing a similar wound and bound in similar fashion. Thompson's body was also similarly taped, but it appeared as though he had pulled the tape apart from his hands. His body was found in the front foyer of the trailer. The fourth victim, Marion Jennings, who had not been bound, was shot once in the right side of the head and once in the chest. All of the victims were dead except for Gardner and Mosby, who were taken to a hospital where they were later pronounced dead. Police retrieved various items of physical evidence from both Thompson's and Mosby's trailers, including the duct tape, bullet casings, and papers.

Based on statements given by Fulton and Branch, police sought the occupants of the dark green van. On the day after the murders, police stopped defendant while he was driving a dark green van. At that time, police merely ticketed defendant for driving on a sus-

pended license. Defendant accompanied police to the station for an interview after the traffic stop and answered their questions regarding his whereabouts on the night of the murders. He told police that he had spent the day with his daughter and then had gone to his girlfriend's home at 10 p.m. After checking on defendant's alibi, police informed him that his girlfriend's statement was inconsistent with his. Defendant then told the officers that he had met with Michael Coleman and two other men at about 9 p.m. The foursome traveled to East St. Louis where they remained until 11 p.m. Defendant then went to his girlfriend's home where he spent the night. Police eventually released defendant from custody because they did not have enough evidence to charge him with the crimes. Defendant left the area to visit a sick relative in Mississippi on November 21, 1993.

Meanwhile, police conducted forensic examinations of the physical evidence found at the scene of the crimes. The bullets found at both trailers were identified as 9 millimeter, and all were fired from the same weapon. Defendant's fingerprints were discovered on the duct tape as well as on the papers found in Mosby's trailer. On November 22, 1993, police filed a five-count information against defendant charging him with the murders. According to the information, all five of the victims died from gunshot wounds to the head.

Detectives Scott Sandidge and Rick Weissenborn located defendant in Cahoa County, Mississippi, and questioned him at the county jail during the afternoon of November 24, 1993. After defendant had been advised of his *Miranda* rights, the officers showed him the information which charged him with the five murders. Defendant told the officers that he "didn't kill no five people." Eventually, defendant admitted his involvement in the murders as detailed above. Defendant told

the officers that he would "stand up for what [he] did." However, he maintained that he had only shot two of the five victims. During the statement, the detectives showed defendant the criminal information which had been filed in the case. After reading it, defendant stated that it contained an error because Jeff Mosby had not been shot in the head but, rather, the chest. At trial, both detectives indicated that such information had not been released to the general public.

Defendant testified in his own behalf at trial. He denied making any of the statements to the police and denied any involvement in the crimes. Although he admitted that he had rented a dark green van during the time in question, defendant denied using it during the evening hours of November 17, 1993. Instead, both he and Michael Coleman drove Coleman's car to a night club in St. Louis. At approximately 10 p.m., they went to the home of Coleman's uncle and met Eric Coleman, Christopher Whitehead, Yulanda Allen, and a few of her friends. He told Allen that he would stop by her home later. Defendant and his friends then went to a fast food restaurant and bought some liquor. He arrived at Allen's home around 11 p.m.

In rebuttal, both Marshall Bradley, defendant's cousin, and Katina Foots, defendant's acquaintance, testified that they heard defendant admit his involvement in the crimes in a manner consistent with his statement to police. Defendant made the statements two days after the murders. Both witnesses stated that defendant referred to the children who had been in Mosby's trailer at the time and wondered if they could identify him. Defendant also stated that he would have shot the children, but did not do so because he did not think they would be able to identify him.

Following closing arguments and instructions, the jury found defendant guilty on all five counts of murder.

After the first stage of the sentencing hearing, the jury found defendant eligible for the death penalty, as the defendant was over 18 years of age and had been convicted of murdering at least two individuals. At the second stage of the hearing, the State presented the testimony of several relatives of the victims as well as evidence of defendant's previous convictions for delivery of a controlled substance and aggravated assault. The State also presented the testimony of two witnesses who were incarcerated in the county jail with defendant prior to trial. Neither man heard defendant express any remorse for the crimes. In fact, one of the men, Michael Lockett, heard defendant admit to the shootings and state that "he would live to kill again, look how many [he'd] gotten away with."

Defendant presented evidence in mitigation consisting of the testimony of several relatives and friends who related that defendant had been brought up by his maternal grandmother and various members of his extended family. Although defendant had been sick at birth, he overcame his illness and developed into a healthy child. The witnesses stated that defendant helped around the home with chores and was obedient. Each testified that defendant enjoyed a warm relationship with his three children, particularly his young daughter.

At the conclusion of the second stage of the sentencing hearing, the jury found no mitigating circumstances sufficient to preclude imposition of the death penalty. Accordingly, the circuit court sentenced defendant to death for each of the five murders. The circuit court later denied all post-trial relief sought by defendant.

## ANALYSIS

### I. Trial Issues

*Improper Cross-Examination*
Defendant first argues that the circuit court denied

him a fair trial by allowing the State to engage in improper cross-examination. Specifically, defendant points to the following question posed to him by the prosecutor immediately after defendant testified that talking to the police can get a person killed:

> "Q. Let's talk about what will get you killed. Leaving witnesses alive can do that.
>
> MR. HAWKINS [defense counsel]: Objection, Your Honor.
>
> THE COURT: Sustained."

Defendant contends the prosecutor later returned to the improper theme of leaving witnesses alive by referring to defendant's direct examination. At that time, the prosecutor attempted to ask defendant about his concern "that witnesses are left around afterwards—." The prosecutor did not complete the question because the circuit court sustained defense counsel's objection. In an unrelated matter, defendant also claims that the prosecutor also improperly asked him to explain "why police officers with forty years of experience would lie about a statement [defendant had] made."

The State asserts that each of these claims has been waived because they were not contained in either defendant's *pro se* post-trial motion or the post-trial motion prepared by his attorney. We agree. This court has consistently recognized that the failure to raise an issue in a written motion for a new trial prevents raising the issue on appeal. See *People v. Redd*, 173 Ill. 2d 1, 27 (1996); *People v. Pasch*, 152 Ill. 2d 133, 173 (1992); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Thus, we must determine whether defendant's waiver may be excused under plain error.

Under the plain error doctrine, courts may address a waived issue if the evidence is closely balanced or if the error affects substantial rights. 134 Ill. 2d R. 615(a); *People v. Carlson*, 79 Ill. 2d 564 (1980). Neither prong of the exception is satisfied in this case. First, the evidence

of defendant's guilt was overwhelming. Defendant himself admitted his involvement in the crimes to police officers and acquaintances. Moreover, as noted above, physical and circumstantial evidence presented at trial was substantial and uncontradicted. Second, we do not believe that any of the alleged errors affect a substantial right or call into question the integrity of the proceeding. We note that two of the three remarks were the subject of a contemporaneous objection at trial. In our view, the trial judge's prompt sustaining of the objection adequately prevented any error from reaching constitutional proportions. See *People v. Hobley*, 159 Ill. 2d 272, 315 (1994).

### Denial of Appointment of New Counsel for Post-Trial Proceedings

Defendant next asserts that the circuit court erred by not appointing a new attorney to argue his *pro se* post-trial motion which alleged that his trial counsel was ineffective. The record reveals that defense counsel had filed a post-trial motion for a new trial at the conclusion of the sentencing hearing. Shortly thereafter, defendant filed a *pro se* "Motion For a New Attorney," alleging that defense counsel had filed the motion for a new trial without first consulting or seeking defendant's approval. Defendant further complained that his counsel's motion was inadequate to preserve "all issues of error" for appellate review. Finally, defendant alleged that his counsel had been ineffective throughout the proceedings and requested that the court appoint a new attorney to represent him in the post-trial proceedings. The court denied defendant's *pro se* motion for a new attorney on April 19, 1995.

On that same day, immediately after the circuit court denied defendant's "Motion For a New Attorney," the court allowed defendant to file a *pro se* "Amended Post-Trial Motion." In that motion, defendant raised

numerous allegations concerning prosecutorial misconduct, judicial bias, and ineffective assistance of counsel. Specifically, defendant contended, among other things, that his attorney failed to adequately prepare for trial because he did not (i) investigate relevant facts and interview "relevant witnesses," (ii) "utilize available means of discovering exculpatory evidence available to the State or to discover the State's case," (iii) explore plea bargaining opportunities, (iv) have certain physical evidence (*i.e.*, the duct tape and the papers) examined by an independent forensic expert after the court allowed the appointment for such an expert, and (v) present mitigation evidence that was available "that would have prevented the imposition of the death penalty." The circuit court denied both counsel's motion and defendant's amended motion.

Defendant now contends that the circuit court erred by not appointing a new attorney to investigate and argue defendant's assertions regarding the ineffectiveness of his original trial counsel. He invites this court to remand the matter to the trial court with directions to appoint new counsel and to hold a hearing on the matter. We decline to do so.

This court has never held that new counsel *must* be appointed every time a defendant presents a *pro se* motion for a new trial alleging ineffectiveness of counsel. See *People v. Nitz*, 143 Ill. 2d 82, 134 (1991). Rather, to determine whether new counsel should be appointed, the circuit court should examine the factual matters underlying defendant's claims and, if the claim lacks merit or pertains to matters of trial strategy, new counsel need not be appointed. *Nitz*, 143 Ill. 2d at 134.

We have carefully examined defendant's claims and conclude that they do not meet the criteria established in *Nitz* for the appointment of new counsel. To begin with, four out of the five allegations raised by defendant

are conclusory and therefore lack merit. For example, defendant claims that his counsel should have investigated "relevant facts and witnesses," but he has offered neither the circuit court nor this court any explanation as to what or to whom he is referring. Likewise, defendant has not set forth the nature of the exculpatory information his counsel should have discovered. Nor does defendant elaborate on how defense counsel's failure to pursue plea bargaining possibilities was anything other than trial strategy, particularly where it is not alleged that the other codefendants were offered pleas. See *People v. Palmer*, 162 Ill. 2d 465, 477 (1994). Defendant's contention regarding his attorney's failure to adduce mitigation evidence during the sentencing hearing is equally without merit. In his motion, defendant does not reveal the character of the mitigation evidence to which he alludes, nor does he state how it would have changed the outcome. Additionally, the record reveals that his attorney did in fact call a total of eight witnesses during the mitigation phase of the hearing. Thus, this is not a case in which absolutely no evidence in mitigation was presented to the jury.

Defendant's remaining claim, that his attorney should have presented the testimony of a forensic expert to dispute the State's fingerprint evidence, fares little better. Trial testimony indicated that the State's expert, Garold Warner, and two of his associates concluded that there were 25 "points of agreement" between defendant's fingerprints and those found at the scene of the crimes. According to Warner, fingerprint examiners in the United States tend to use between 8 and 10 points of agreement before arriving at a conclusion. Based on this evidence, it cannot be said that defense counsel's decision not to call an independent expert constituted ineffectiveness. It may very well have been a matter of trial strategy to not call an expert—a withering cross-

examination as to the points of agreement could only serve to reinforce the strength of the fingerprint identification in the eyes of the jury.

As we stated in *Nitz*, new counsel should be appointed only if the *pro se* allegations show possible neglect of the case. *Nitz*, 143 Ill. 2d at 134. In the case at bar, however, defendant's contentions either are insufficient to show possible neglect or concern decisions made by counsel which were well within the bounds of proper trial strategy. They simply do not constitute strong and convincing proof of incompetency when considered against the totality of counsel's conduct during trial. See *People v. Generally*, 170 Ill. App. 3d 668, 677 (1988). For these reasons, the circuit court's ruling in this matter will not be disturbed.

## II. Sentencing Hearing Issues

### *Testimony of Victims' Relatives*

Defendant maintains that the circuit court violated his eighth amendment right to a fair sentencing hearing by allowing members of the victims' families to testify as to their belief that the death penalty should be imposed. Specifically, defendant cites as improper several questions posed by Special Assistant Attorneys General Keith Jensen and Duane Bailey to the three relatives of the victims called by the State during aggravation. Both Jensen and Bailey asked each witness which penalty he or she wanted the jury to impose. In response, each witness expressed the desire that the jury impose the death penalty. Defendant concedes that he has waived this issue because no contemporaneous objection was made during the hearing; however, he posits that defense counsel's failure to object constitutes ineffective assistance of counsel. Accordingly, we will review the claim on the merits.

Generally, in order to establish ineffective assistance

of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for the error, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). However, we may resolve a claim of ineffective assistance of counsel by reaching only the prejudice component, for lack of prejudice renders irrelevant the issue of counsel's performance. *People v. Erickson*, 161 Ill. 2d 82, 90 (1994).

The State acknowledges in its brief that the testimony of David Thompson, Sr., Estella Buckles, and Christine Mosby regarding the appropriateness of the death penalty was improper under *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987), *rev'd in part*, *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991). Such a violation, however, is subject to a harmless error analysis, and, therefore, reversal is not mandated in every instance. See *People v. Scott*, 148 Ill. 2d 479, 554 (1992).

Contrary to defendant's contentions, we are unconvinced that the outcome in this case would have been different had the complained-of testimony been properly excluded. The remainder of the State's case in aggravation was remarkably strong. Indeed, the murders for which defendant stands convicted were cold-blooded and methodical. Three of the victims were bound hand and foot and summarily executed. Another victim, an unsuspecting neighbor who had no involvement with the drug money, was shot when he understandably acted confused when defendant came to his door, displaying a gun and demanding money.

Additional testimony, which we can only characterize as disturbing, revealed that after police released de-

fendant from questioning, he expressed regret over not killing the children who were in Mosby's trailer because they might identify him. Thus, defendant's remorse in the case stems not from the killing of five individuals (two of whom he personally shot), but stems from his *not* killing three young children. Defendant also told another State witness that he "would live to kill again." These facts lead to the inescapable conclusion that defendant utterly lacked any remorse for his crimes or rehabilitative potential. In contrast, the evidence in mitigation was slight—family members and friends testified that defendant came from a religious household and cared deeply for his children.

Accordingly, the State's evidence, coupled with the circuit court's instruction to the jury that its decision was not to be swayed by sympathy, passion, or prejudice, compels our conclusion that the error in admitting the improper testimony was harmless beyond a reasonable doubt, and that no prejudice resulted to defendant from its admission. Therefore, we cannot conclude that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

That said, we stress that our resolution of this issue is derived from the particular facts of this case and the overwhelming nature of the State's aggravating evidence at the sentencing hearing. The case at bar was tried in 1995, some seven years after the United States Supreme Court's decision in *Booth v. Maryland* and four years after its decision in *Payne v. Tennessee*. As such, there is simply no reason for either Jensen or Bailey to have asked the members of the victims' families for their opinions in the manner revealed in this record. We, therefore, are obliged to alert the State that the

future commission of such errors may not produce a similar result and caution it that a closer case in aggravation/mitigation may well result in reversal.

### Improper Remarks Made to the Jury

Defendant next maintains that he was denied a fair sentencing hearing by virtue of certain of the trial judge's remarks which were made at the outset of the jury selection. Specifically, he points to a comment made by the judge to a group of prospective jurors regarding the imposition of the death penalty:

> "If you find that the Defendant is not eligible, that's it. The Defendant would be sentenced by the Court. If you find that the Defendant is eligible, then we go to phase, what is called phase three or a third phase, which is the aggravation/mitigation phase. And that is the phase where you would be deciding whether or not the Defendant should receive the death penalty.
>
> Based on what you hear at that phase, and again, you will be instructed, you would be given instruction by the Court that you would have to follow to make that determination. *If you determine that he should not receive the death penalty*, then he will be sentenced by the Court. If you determine that he should, then that would be the sentence imposed.
>
> As will be explained at that time, *all of these decisions have to be unanimous decisions*. That means all twelve people have to make a unanimous decision." (Emphasis added.)

Defendant now contends that the emphasized statement may have misled the jury into thinking its decision to not impose the death sentence would have to be unanimous. Defendant makes this argument despite the fact that the remark was made by the court one week before the jury deliberated its sentencing decision, that it was heard by only 3 of the 12 jurors eventually impaneled in this case, and that, even if it were confusing, it was later cured by the court's giving of jury instructions which correctly set forth the requirements for the

imposition of the death penalty. However, without addressing the doubtful merits of this claim, we note that defendant failed to make a timely objection and to include it in the post-trial motion; therefore, it is barred from review.

Moreover, we find no reason to excuse the procedural default under the plain error doctrine. The evidence adduced at the hearing cannot be said to have been closely balanced, nor did the trial court's misstatement affect a substantial right. As we just noted, prior to its deliberations at the conclusion of the aggravation/mitigation phase of the hearing, the jury was properly instructed as to the legal requirements for the imposition of the death penalty. *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), relied upon by defendant, did not involve an allegedly confusing remark to the jury which was later rehabilitated by a proper jury instruction. Instead, *Kubat* concerned the effect of an improper jury instruction itself. Because we believe *Kubat* is wholly inapposite to the case at bar, we decline defendant's invitation to raise a single misstatement made by the judge during *voir dire* to the level of improperly instructing the entire jury.

In a similar vein, defendant also takes issue with a comment made by the trial judge before a different group of prospective jurors during *voir dire*. At the time, the judge was questioning a prospective juror about why he had indicated on his juror information card that he would not impose the death penalty under any circumstances:

"PROSPECTIVE JUROR: I wouldn't under any circumstances. I am, my answer is based on my own feelings, that in putting myself in that particular situation, if the death sentence was imposed on me, I would want it done. And it is not being done at that time.

THE COURT: Okay. But that is not a consideration for this jury to determine.

PROSPECTIVE JUROR: I know it.

THE COURT: If they in fact carry it out or do not carry it out, there is nothing that anyone in this room, including myself, can do about that.

What I am asking you, would you refuse to impose it because of that then?

PROSPECTIVE JUROR: No."

The prospective juror was eventually excused; however, defendant claims that 2 of the 12 members of his jury heard the exchange. He argues that the judge's comment improperly minimized the jurors' sense of responsibility over their decision whether to impose the death penalty.

Like the other comment made during *voir dire*, defendant failed to object to the trial judge's remark at trial and failed to include the issue in either of his post-trial motions. Accordingly, the issue has not been properly preserved for review.

Moreover, defendant's procedural default cannot be excused under the plain error doctrine. As explained above, the evidence at the sentencing hearing was not closely balanced. We also disagree with defendant's characterization of the comment as a deprivation of his eighth amendment right under *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985). In *Caldwell*, the prosecutor informed the jury during closing argument that its decision was automatically reviewable by the state supreme court. On appeal, the United States Supreme Court held that it is constitutionally impermissible to rest a death sentence on a decision made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of defendant's death sentence rests elsewhere. *Caldwell*, 472 U.S. at 328-29, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639. In contrast, the trial judge here directed his remark to a prospective juror who never sat on defendant's jury. Although defendant claims that the remark

was made in the presence of two of his eventual jury members, our review of the record indicates that no similar comment was made to them by the trial judge when he spoke to them directly. Thus, defendant's contention is based on the speculation that (i) the two eventual jurors heard the remark and (ii) they remembered it one week later during sentencing deliberations. The holding in *Caldwell* did not rest on such attenuation, as it was indisputable that the entire jury heard the prosecutor's closing argument. Even so, the trial judge's remark was not of the same caliber as those in *Caldwell*. Here, the trial judge did not convey the notion that responsibility for sentencing rested elsewhere. Rather, the judge correctly informed a prospective juror that his concerns over whether the sentence would ever be carried out were not to influence his decision regarding the appropriateness of the penalty. Put another way, the judge correctly informed the venireman that the jurors were to follow the law, as set forth in the instructions that they would receive from the judge. Given these facts, any error on the part of the trial judge in making the remark does not rise to the level necessary to meet the second prong of the plain error rule.

Nevertheless, defendant argues that the judge's erroneous statement during *voir dire* was compounded during the actual sentencing hearing when the State argued that

"[y]ou are going to be told that it is in your hands whether to kill Sherrell or not. I don't believe that is going to be the question. I believe the question was decided a long time ago.

It is not within my hands to kill Sherrell Towns, and I use the word kill because that is what you have been told previously. It is not within [the defense attorneys'] or even [the judge's] hands. It's not in your hands to do that.

Because the actions that dictate a death penalty were all caused by Sherrell Towns. He committed the offense, not you. Your decision is to execute and sign the death

penalty verdict form based upon what he did. There is no responsibility on your part for what he did. No one made him do it, no one asked him to do it. He did it of his own free will and his own volition."

These comments are similar to those this court has previously upheld in *People v. Page*, 156 Ill. 2d 258, 284 (1993). As in that case, we are of the opinion that the prosecutor did not attempt to suggest to the jury that they were relieved of their responsibility by defendant's own actions. See *People v. Hudson*, 157 Ill. 2d 401, 460 (1993). The jury in this case was correctly instructed on its role in the sentencing process, and we do not believe that the jury would have interpreted the comment as contradicting those instructions. As such, the prosecutor's remarks did not run afoul of the *Caldwell* decision and do not constitute plain error.

Defendant also maintains that he was denied a fair sentencing hearing when the prosecutor told the jury

"[not to] get caught up in the business about he will be in a cage his whole life. That sounds horrible. But this cage is the same cage he has been through before. The penitentiary system with exercise yards, with work programs, with all kinds of facilities.

And likewise lawyers sometimes either inadvertently or intentionally don't get everything out. Instruction that you are going to get from the Court will tell you that no person serving a natural life sentence of imprisonment can be paroled or released, except through an order of the governor of executive clemency.

*There is always the loop hole, there is always the chance, there is always that little extra business. No one can say what will happen.*" (Emphasis added.)

Pointing to the portion of the statement emphasized above, defendant claims the prosecutor improperly asked the jury to speculate as to what might happen if defendant were not sentenced to death.

We note that defendant is precluded from asserting this issue on appeal due to his failure to object to the statement at trial and his failure to include the issue in

the post-trial motions filed in this case. In addition, the claim does not fall within the purview of the plain error doctrine because the evidence at the sentencing was not closely balanced nor is a substantial right affected. We note that although an argument commenting on the possibility of defendant's being released and committing future crimes would be improper (see *People v. Gacho*, 122 Ill. 2d 221 (1988)), the prosecutor here did not so argue. Instead, the comment merely restated the jury instruction that persons serving terms of natural life imprisonment will not be paroled or released except through executive clemency. See *Gacho*, 122 Ill. 2d at 262.

*Admission of Gang Affiliation & Other-Crimes Evidence*

Defendant next argues that he was prejudiced during his sentencing hearing by the circuit court's admission of certain testimony concerning defendant's (i) gang membership and (ii) involvement in other crimes. We address each in turn.

The State called Michael Lockett to testify during the aggravation/mitigation phase of the sentencing hearing as to certain statements made to him by defendant while both were incarcerated in the same correctional center. Throughout his cross-examination, defense counsel attempted to impeach Lockett by eliciting from him his motivation for testifying. Defense counsel intimated, for example, that Lockett was awaiting sentencing for attempted murder and aggravated battery and was "hoping to get something" in exchange for his testimony. When Lockett denied the charge, defense counsel inquired about a pin which was affixed to Lockett's lapel. Lockett indicated that the pin signified a "conservative vice lord." On redirect, the prosecutor asked whether defendant was a gang member. Over a defense counsel objection, Lockett responded that defendant was a "gangster disciple." Lockett further

indicated that it was "difficult" to testify against a gang member and fellow inmate because "all types of things could happen" to him. On re-cross-examination, defense counsel then asked Lockett whether his gang "[got] along" with defendant's gang. Lockett admitted that they do not.

Defendant now contends that the circuit court should have excluded this evidence of defendant's gang affiliation. This court has consistently held that evidence of gang affiliation is admissible as long as the relevance of the evidence is established. *People v. Hope*, 168 Ill. 2d 1, 40 (1995), citing *Dawson v. Delaware*, 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992). We note that in this case, it was defense counsel's attempt to impeach Lockett's credibility by noting his gang affiliation which opened the door to the State's inquiry concerning defendant's affiliation and the concomitant risks which attended Lockett's testimony against another gang member. Indeed, defendant's gang membership became relevant, as it provided the jurors with a clearer picture of all the potential motivations behind Lockett's testimony, thereby aiding them in evaluating the veracity of his testimony. For example, fear of reprisal might have made Lockett's testimony more believable. On the other hand, rivalry between the two gangs might have detracted from its believability. Under these circumstances, the relevance of the evidence cannot be seriously questioned.

Defendant also maintains that he suffered prejudice when Lockett testified that defendant had told him that it did not matter whether he was convicted of the five murder charges and to "look at how many he had gotten away with." Defendant argues that the remark was uncorroborated, and that the circuit court should have given the jury some guidance to assist it in determining whether the purported conversation actually occurred or whether it constituted "mere bragging."

Defendant's claim does not persuade. Under the provisions of section 9—1(e) of the Criminal Code of 1961, a jury is allowed to hear and consider information during sentencing regardless of its admissibility under the rules governing the admission of evidence at criminal trials. 720 ILCS 5/9—1(e) (West 1992). Although we have recognized that some precautions may be necessary to preclude the "contaminating influence" of improper information from influencing the jury (see *People v. Devin*, 93 Ill. 2d 326, 348 (1982)), we are of the opinion that the jury in this case received sufficient instruction in assessing the testimony. The circuit court gave the jury Illinois Pattern Jury Instruction No. 1.02 (Illinois Pattern Jury Instructions, Criminal, No. 1.02 (3d ed. 1992)), which informed the jury that it could take into account a witness' bias and the reasonableness of his testimony.

We further note *Devin*, the sole case to which defendant cites in support of this argument, is readily distinguishable from the case at bar. There, several witnesses testified at the sentencing hearing that defendant had recounted to them detailed, graphic descriptions of torture and murder. However, psychiatric experts all agreed that a sociopathic personality (which defendant possessed) frequently engages in homicidal fantasies. As a result, this court reasoned that the jury should have been alerted to the possibility that defendant's descriptions could have been the product of fantasy and not defendant's actual conduct. *Devin*, 93 Ill. 2d at 348-49. Lockett's testimony in this case in no way compares to the testimony given in *Devin*. Nor are we confronted with the type of psychiatric testimony which called the *Devin* testimony into question. For these reasons, we conclude that a new sentencing hearing is not required in this case.

*Disproportionality of Defendant's Death Sentence*
Defendant further argues that his sentence of death

is disparate from the natural life sentence received by codefendant Coleman, who was also convicted of five counts of murder. Defendant points to the following evidence of disparate sentencing: Coleman was older than defendant, Coleman was the "mastermind" behind the crimes, Coleman's prior record was more extensive than that of defendant, and Coleman's role in the offenses was equal to defendant's. Defendant maintains that his disparate sentence violates the constitutional prohibition against the arbitrary and capricious imposition of the death penalty.

We begin our analysis of this issue by noting that the United States Supreme Court has held that the eighth amendment does not require comparative proportionality review if the death penalty statute contains provisions that ensure the rational, consistent, nonarbitrary imposition of the penalty. *Pulley v. Harris*, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984). Our death penalty statute is such a statute. See *People v. Kitchen*, 159 Ill. 2d 1, 44 (1994). Nevertheless, this court has previously chosen to exercise its discretion and has considered whether a sentence of death in a particular case is disproportionately harsh in comparison with the less severe sanction imposed on a codefendant convicted of the same crime. See *People v. Bean*, 137 Ill. 2d 65 (1990); *People v. Ashford*, 121 Ill. 2d 55, 82-90 (1988); *People v. Gleckler*, 82 Ill. 2d 145, 167-69 (1980). Factors of particular relevance include the extent of defendant's involvement in the offense, the nature of the offense, the character and background of the defendant, including any criminal record, and his potential for rehabilitation. *Kitchen*, 159 Ill. 2d at 44. Thus, in the past, this court has examined the facts of the particular case and the evidence introduced at both the trial and the sentencing hearing. We may also consider, as a matter of reference, the sentence imposed on a codefendant in light of his involvement in the offense.

In this case, the record contains evidence that defendant asked one of his cousins to participate in the armed robbery. In addition, defendant supplied the vehicle which enabled the trio to get to the crime scene. Therefore, we have little difficulty in dismissing defendant's contention that Coleman was the sole "mastermind" behind the crimes. There is ample support in the record for the conclusion that defendant equally took part in the planning of the crimes. Moreover, once the armed robbery commenced, the evidence revealed that defendant shot two of the five victims. The other three victims were shot by codefendant Remon Williams. There is no evidence in this record that Coleman acted as a triggerman. It is particularly relevant, in our view, that defendant *admitted* to being the first to shoot any of the victims and to being Jeff Mosby's assailant. Thus, it was defendant, and not Coleman, who turned the armed robbery into a mass murder. We note that defendant has supplemented the record in this case with testimony from Coleman's trial in which one of the children in Mosby's trailer testified that Coleman shot Mosby. However, we are also aware of other testimony in the case which revealed that defendant, not Coleman, shot Mosby. We will not speculate as to how Coleman's jury resolved this factual question.

Furthermore, defendant has presented this court with little evidence of Coleman's character, apart from his prior criminal history. Although Coleman's prior criminal record may be quantitatively more severe than defendant's, that is but one factor in our evaluation. Testimony adduced at both the trial and the sentencing hearing provides some insight into defendant's character which we do not have with respect to Coleman. We note that after being questioned by police and released, defendant fled the state. Even after being indicted in these crimes, defendant, a father of three children, could only

express regret that he did not kill the only eyewitnesses to his deeds, the three children in Mosby's trailer. While awaiting trial on these charges, defendant told a fellow inmate he would live to kill again. Thus, defendant exhibited no remorse whatsoever for his crimes and displayed a chilling lack of rehabilitative potential. On this record, we cannot say defendant's death sentence is disproportionate to Coleman's life sentence.

In summary, we conclude that defendant's conduct must be considered more culpable than that of Coleman in that it was defendant's actions which precipitated the gunfire at the trailers. In light of defendant's character, Coleman's more severe criminal record, standing alone, does not render defendant's death sentence disparate. For these reasons, we reject defendant's contentions that his death sentence is unreasonably disproportionate from the natural life sentence imposed on Coleman.

### III. Constitutionality of Statute

In his final two arguments, defendant challenges the Illinois death penalty statute (720 ILCS 5/9—1 (West 1992)), asserting it is unconstitutional because, once a statutory aggravating factor is found, the defendant bears the burden of persuading the jury that death should not be imposed. He maintains that the statute thereby creates a rebuttable mandatory presumption in favor of the death sentence, which contravenes the eighth amendment. This court has repeatedly rejected this contention (see, *e.g.*, *People v. Burt*, 168 Ill. 2d 49, 81 (1995); *People v. Simms*, 143 Ill. 2d 154, 183-84 (1991); *People v. Fields*, 135 Ill. 2d 18, 76 (1990)), and we do so here again today.

Defendant also argues that although various aspects of the statute have been found constitutional individually, the cumulative effect of all the aspects is to render the statute unconstitutionally arbitrary and capricious. We have considered and rejected this argument numer-

ous times (see *People v. Edgeston*, 157 Ill. 2d 201, 247 (1993); *People v. Thomas*, 137 Ill. 2d 500, 549-50 (1990); *People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989)), and defendant offers us no reason to reconsider our past holdings.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Madison County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, March 18, 1997, as the date on which the sentence of death entered in the circuit court of Madison County is to be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*