NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241170-U

NO. 4-24-1170

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 31, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MERCEDEZ LEMONE BYRD, | ) | No. 20CF1011 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant's *pro se* posttrial claim of ineffective assistance of counsel was not
conclusory or immaterial and new *Krankel* counsel (see *People v. Krankel*, 102
Ill. 2d 181 (1984)) should have been appointed.

¶ 2     Defendant, Mercedez Lemone Byrd, was convicted of multiple counts of criminal

sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2016)) and aggravated criminal sexual abuse

(*id.* § 11-1.60(d)) following a jury trial and sentenced to an aggregate term of 97 years in prison.

Defendant previously appealed his convictions and sentences, arguing, in part, that the trial court

erred in failing to conduct an inquiry into the factual basis of his *pro se* posttrial claims of

ineffective assistance of counsel, as required by the procedure developed by our supreme court in

*People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny.

¶ 3     We agreed with defendant on appeal and remanded for the trial court to conduct

an inquiry into the factual basis of defendant's allegations, while also retaining jurisdiction over

his unaddressed appellate claims. See *People v. Byrd*, 2023 IL App (4th) 220894-U, ¶¶ 20, 22. Following the *Krankel* inquiry on remand, the trial court declined to appoint defendant new counsel for various reasons including that his claims were "conclusory" and "legally immaterial" and failed to show possible neglect of the case. We allowed defendant leave to file a late notice of appeal.

¶ 4        On appeal, defendant argues (1) the trial court erred in declining to appoint him new counsel where his *pro se* posttrial claims of ineffective assistance showed possible neglect of the case and (2) the court erred in allowing the State to present propensity evidence pursuant to section 115-7.3 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-7.3 (West 2020)). We agree with defendant's first argument and, because we find it dispositive for purposes of resolving the instant appeal, discuss only the facts related to that claim.

¶ 5                          I. BACKGROUND

¶ 6                          A. The Charges

¶ 7        In September 2020, a grand jury returned bills of indictment charging defendant with, in relevant part, 13 counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2016)) and 5 counts of aggravated criminal sexual abuse (*id.* § 11-1.60(d)). The State alleged that defendant committed various sexual acts against A.R. (born June 2003), who was the daughter of his then-girlfriend, S.R., between June 15, 2016, and June 30, 2020. With respect to the aggravated criminal sexual abuse charges, the State alleged that defendant knowingly committed acts of sexual conduct with A.R. involving his hand and her breast for the purpose of sexual gratification or arousal. As for the criminal sexual assault charges, the State alleged that defendant, while holding a position of trust or authority in relation to A.R., knowingly committed acts of sexual penetration involving: (1) his hand and her vagina, (2) his penis and her vagina,

- 2 -

(3) his mouth and her vagina, and (4) his penis and her mouth.

¶ 8                                    B. The State's Section 115-7.3 Pretrial Motion

¶ 9            Prior to trial, the State filed a motion pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2020)), seeking to introduce other-crimes evidence for the purpose of showing defendant's propensity to commit sex offenses against minors. Specifically, the State sought to introduce evidence of sexual contact defendant made with Z.S. (born August 1999) while he was dating and living with her mother. The State proffered that Z.S. would testify to the following instances of sexual abuse: (1) when she was 10 years old and falling asleep on her mother's bed, defendant laid down next to her and "rubbed her on the thighs and buttocks"; (2) from the time she was 12 years old until the time defendant moved out when she was in the eighth grade, defendant, on a weekly basis, would enter her room while she slept and "rub[ ] her buttocks while [he] was only wearing a towel"; (3) a specific instance in which she awoke to defendant on top of her wearing nothing but a towel; and (4) an instance in which defendant "reached into [her] pants and touched the outer part of her unclothed vagina" while he "was putting oil on [her] dry back." Following a hearing, the trial court granted the State's motion.

¶ 10                                            C. The Jury Trial

¶ 11            Defendant's jury trial was conducted on June 22 and June 23, 2022. The State called the following witnesses to testify: A.R., A.R.'s mother, S.R., A.R.'s twin sister, A.A, and Z.S, who testified consistently with the State's pretrial proffer. The State did not present any physical, digital, or DNA evidence linking defendant to the alleged crimes. A.R. was the only witness to provide direct evidence of the alleged conduct.

¶ 12            The State's evidence demonstrated that defendant was in a romantic relationship with S.R. and lived with her, A.R., and A.A. from 2015 to the summer of 2020—when A.R.

- 3 -

made her initial outcry. They lived at three different residences in Bloomington, Illinois, during this period. From 2015 to the fall of 2017, they lived in a two-story, two-bedroom apartment on West Monroe Street. A.R. and A.A. shared a bedroom with a bunk bed at the West Monroe Street residence. S.R.'s eldest daughter, I.R., also lived with them at the West Monroe Street apartment, and her girlfriend would frequently stay the night. In the fall of 2017, defendant, S.R., A.R., and A.A. moved into an upstairs two-bedroom apartment situated in a converted house on East Monroe Street. A.R. and A.A. again shared a bedroom with a bunk bed at the East Monroe Street residence. Defendant also had his own personal apartment on the main floor of the house. In the summer of 2019, the four of them moved into a three-bedroom mobile home on Yucca Drive. A.R. and A.A. each had their own bedroom at the Yucca Drive residence. During the period that defendant and S.R. were dating, S.R.'s work schedule varied such that it sometimes required her to work at night or travel out of state. When S.R. was traveling or working at night, defendant would stay at home with A.R. and A.A. According to S.R., defendant normally slept with her in the same bedroom, but he sometimes fell asleep playing video games on the living room couch.

¶ 13        A.R. testified that at the time of trial, she was 19 years old, finishing her senior year of high school, and living with her mother, twin sister, and biological father. A.R. testified that throughout her time living with defendant, he would routinely: (1) touch her vagina, breasts, and buttocks with his hands, both over and under her clothing, (2) touch her breasts and vagina with his mouth, (3) insert his penis into her vagina, and (4) make her touch his penis with her mouth and hands. According to A.R., she touched defendant's penis with her mouth and hands only at the East Monroe Street and Yucca Drive residences, while the remainder of the sexual contact occurred at all three residences. When asked to estimate how often the sexual contact

- 4 -

occurred, A.R. answered, "There's no counting on my hand. It was any time that he wanted it." A.R. further testified that there were times defendant would refuse to give her a ride to visit friends unless she had sex with him first and there were times he would force her hand or head to touch his penis. A.R. also testified to seven specific instances of alleged sexual abuse perpetrated by defendant.

¶ 14　　　　On cross-examination, A.R. acknowledged that she argued with defendant "a lot," but she denied having ever told her mother that she wanted defendant to move out and her biological father to live with them instead. She acknowledged that she had a "big argument [with defendant] just before" making the instant allegations. The argument centered around A.R. going to a "family fun park" called Grady's with her friend and wanting to stay the night with that friend. A.R. testified:

> "I was going to Grady's to meet up with a friend. I was in the car,
> he started talking to me like I was his child. I said, don't talk to me like
> I'm his child. I was already going to tell my mom about what was going
> on. I just didn't have the courage to say anything because I didn't know
> what the outcome was. So I was already talking to my ex-girlfriend about
> telling someone, I should tell someone, like I don't want it to keep
> happening."

¶ 15　　　　Defendant testified on his own behalf. He denied all the allegations raised against him. He testified that he and A.R. constantly "bumped heads" because "she felt resentment [he was] in the home and her father wasn't." According to defendant, the day before A.R. made her initial outcry, he, S.R., and A.A. gave A.R. a ride home from Grady's. Defendant testified that A.R. was upset because her friend had left her at the park. While they were driving home, A.R.

"jumped out" of the vehicle while it was still moving. After approximately 30 minutes of searching for her, S.R. called the police. The police located A.R. at her girlfriend's house later that night, and she ended up staying the night at her aunt's house. Defendant testified that he learned of the allegations the next day: "So this took place on a Tuesday, [and] I was *** made aware of it Wednesday. *** She went to the hospital I guess the very next day to do—because she made the allegations, so of course they had to do a rape kit and all of that."

¶ 16    Following the arguments of the parties, the jury found defendant guilty of each count beyond a reasonable doubt.

¶ 17                              D. Sentencing

¶ 18    At the sentencing hearing, defendant made a statement in allocution, in which he criticized his defense as follows: "Crucial pieces of evidence in my defense were never mentioned or brought up, and if they had been, I am beyond confident the jury would have rendered a not guilty verdict." He also challenged the sufficiency of the State's evidence and identified several pieces of evidence that would have purportedly undermined the State's case if presented at trial. No follow-up questions were asked about any of the allegations he raised in his statement.

¶ 19    Ultimately, the trial court sentenced defendant to consecutive seven-year terms of imprisonment on the 13 criminal sexual assault convictions (720 ILCS 5/11-1.20(a)(4) (West 2016)) and to concurrent six-year terms of imprisonment on the 5 aggravated criminal sexual abuse convictions (*id.* § 11-1.60(d)). The court ordered the sentences for criminal sexual assault to run consecutively to the sentences for aggravated criminal sexual abuse, for an aggregate term of imprisonment totaling 97 years.

¶ 20                    E. Defendant's Initial Direct Appeal

¶ 21    Defendant appealed his convictions and sentences, arguing, in relevant part, that he raised a *pro se* posttrial claim of ineffective assistance of counsel at the sentencing hearing sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry into the factual basis of the claim. See *Byrd*, 2023 IL App (4th) 220894, ¶¶ 3. On appeal, we found the above-quoted portion of defendant's statement in allocution, along with his identification of purported exculpatory evidence that had not been introduced at trial, were sufficient to trigger the court's duty to conduct a *Krankel* inquiry. *Id.* ¶ 16-19. Thus, we remanded for the court to conduct an appropriate inquiry, while also retaining jurisdiction over defendant's unaddressed appellate claims. *Id.* ¶ 20.

¶ 22                    F. The *Krankel* Inquiry on Remand

¶ 23    Defendant raised 18 allegations of ineffective assistance of counsel at the *Krankel* hearing on remand. We discuss only the allegation that we find dispositive to resolution of the instant appeal. Specifically, defendant alleged the following:

> "[Counsel] was made aware of [A.R.'s] medical condition, and that she saw a psychiatrist three times a week at school, and that started before I had a relationship with her mother, S.R., and how she constantly fabricated stories on mother and teachers, which led to [the Illinois Department of Children and Family Services (DCFS)] being involved, because they felt concern for *** S.R., because she told [her] teachers she would beat her mom, and beat them if they called home, and try to give her discipline. He never asked for any of the records, nor did he ask for the police files."

¶ 24    Before responding to defendant's allegations, counsel noted that the trial had

taken place several years prior, but, despite the passage of time, he would "do [his] best to respond." Counsel further indicated, "[I]t would be *** ideal if I had some time to go through the file and my notes and address each [allegation] more thoroughly. But based on my recollection, I will attempt to elucidate my recollection of what happened." Counsel then provided the following response to defendant's allegation:

> "He said I was made aware of the accuser's medical conditions and psychiatric records referencing prior lies that she told. I don't know what he means by that. I honestly don't.
>
> I vaguely recall him telling me that she couldn't be trusted, that she wasn't credible. But I attempted in cross-examination to test her credibility as best I could."

Neither defendant nor the trial court asked counsel any follow-up questions, and no further statements were made by either defendant or counsel concerning this allegation.

¶ 25 Following the *Krankel* inquiry, the trial court issued a written order finding, among other things, the above allegation failed to show possible neglect of the case because it was "conclusory and legally immaterial." Specifically, the court provided the following in its written order:

> "Defendant asserts the accuser's medical condition and psychiatric condition was never tested and she had brought up prior allegations before. Counsel *** stated he was not sure what defendant means by this allegation, but he attempted to test the credibility of all the witnesses. *** The Court finds this allegation conclusory and legally immaterial."

¶ 26 This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28            On appeal, defendant argues, in relevant part, the trial court erred in finding his

*pro se* allegation that counsel was ineffective for failing to conduct a reasonable investigation

into A.R.'s background failed to show possible neglect of the case. Specifically, defendant

maintains that his allegation and counsel's response thereto "provide evidence of possible

neglect by [counsel for] failing to conduct a reasonable investigation into evidence—including

medical reports, DCFS records, and other records—that would tend to refute the State's case and

impeach the credibility of A.R."

¶ 29            The common law procedure developed by our supreme court in *Krankel* and its

progeny "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of

trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29.

> "This procedure serves the narrow purpose of allowing the trial court to decide
>
> whether to appoint independent counsel to argue a defendant's *pro se* posttrial
>
> ineffective assistance claims [citation] and is intended to promote consideration of
>
> *pro se* ineffective assistance claims in the trial court and to limit issues on
>
> appeal." (Internal quotation marks omitted.) *People v. Jackson*, 2020 IL 124112,
>
> ¶ 95.

Where, as here, "the trial court has properly conducted a *Krankel* inquiry and has reached a

determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial

court's action was manifestly erroneous. [Citations.] Manifest error is error that is clearly

evident, plain, and indisputable." *Id.* ¶ 98.

¶ 30            When a defendant raises a *pro se* posttrial claim of ineffective assistance of

counsel—thereby triggering the *Krankel* procedure—new counsel is not automatically appointed

to evaluate and investigate the defendant's claim. *Id.* ¶ 97. Instead, the trial court must first "conduct some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 79 (2003). "During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Id.* at 78. "The court may also briefly discuss the allegations with defendant." *Jolly*, 2014 IL 117142, ¶ 30. "[T]he trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79.

¶ 31            "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel." *Jackson*, 2020 IL 124112, ¶ 97. A claim lacks merit if, in pertinent part, "it is conclusory *** or legally immaterial." *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40. "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Jackson*, 2020 IL 124112, ¶ 97. "The new counsel would then represent the defendant at the hearing on the *pro se* claim of ineffective assistance of counsel." *Id.* "[A]ppointed counsel can independently evaluate the *pro se* claim and avoid the conflict of interest that defendant's trial counsel would experience in trying to justify his or her actions contrary to the defendant's position." *Id.*

¶ 32            "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing

professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 33 Here, defendant alleged at the *Krankel* hearing that he had informed counsel prior to trial of A.R.'s "medical condition" and that she "saw a psychiatrist three times a week at school" and "constantly fabricated stories on [her] mother and teachers, which led to DCFS being involved." Defendant further alleged that counsel "never asked for any of the records, nor did he ask for the police files." Counsel responded to defendant's allegation by stating, "He said I was made aware of the accuser's medical conditions and psychiatric records referencing prior lies that she told. I don't know what he means by that." Counsel added, "I vaguely recall him telling me that she couldn't be trusted, that she wasn't credible. But I attempted in cross-examination to test her credibility as best I could." In its written order, the trial court summarized defendant's allegation and counsel's response, before finding the allegation "conclusory and legally immaterial." The court did not further explain its finding.

¶ 34 As an initial matter, we are not able to say that counsel actually denied defendant's allegation. The trial court did not indicate in its order whether it found counsel's response to constitute a denial, nor did it make any explicit credibility determinations at the hearing or in its order. Although counsel's statement—"I don't know what he means by that"— could be interpreted as a denial, it could just as easily be interpreted as an expression of confusion or a lack of memory. There was no follow-up questioning of counsel to clarify what he meant by this statement. Counsel did state that he only "vaguely" recalled having been told that A.R. could not be trusted—suggesting he likely did not recall the details of the conversation. He also stated to the court that it would have been "ideal" if he had had more time "to go through the

- 11 -

file and [his] notes" to address the allegation "more thoroughly." Moreover, in response to a separate allegation by defendant that he had informed counsel of a DCFS investigation against Z.S., counsel stated unequivocally, "I wasn't made aware of that." Had counsel been equally certain the allegation concerning A.R. was false, presumably he would have said as much.

¶ 35    Turning to the merits, we begin by addressing the trial court's finding that defendant's claim lacked merit because it was "conclusory." "An allegation is conclusory when a defendant is unable to add any additional factual basis to support his bare allegation from which a court could infer a basis in support of an ineffective assistance claim." *People v. Roddis*, 2018 IL App (4th) 170605, ¶ 67, *rev'd on other grounds*, *People v. Roddis*, 2020 IL 124352. Our supreme court's decision in *People v. Towns*, 174 Ill. 2d 453, 467 (1996), provides an example of a conclusory allegation. In that case, the defendant alleged his attorney was ineffective for failing to investigate " 'relevant facts and witnesses.' " *Id.* The supreme court found the allegation conclusory because the defendant "offered neither the circuit court nor this court any explanation as to what or to whom he is referring." *Id.*

¶ 36    Here, on the other hand, defendant did not merely allege that counsel was ineffective for failing to investigate " 'relevant facts and witnesses.' " *Id.* Rather, unlike the defendant in *Towns*, he described "to what [and] to whom" he was referring. *Id.* Specifically, defendant alleged that counsel was ineffective for failing to investigate the background of a specific witness—the victim—and he identified what counsel had failed to investigate—"that she saw a psychiatrist three times a week at school *** and how she constantly fabricated stories on [her] mother and teachers, which led to DCFS being involved." Thus, defendant's allegation was not conclusory.

¶ 37    The trial court also concluded defendant's allegation lacked merit because it was

"legally immaterial." "If a claim that is taken as true, either on its face or after inquiry, would still not support a finding of ineffective assistance, then it is legally immaterial." *Roddis*, 2018 IL App (4th) 170605, ¶ 73, *rev'd on other grounds*, *Roddis*, 2020 IL 124352. To find an allegation "legally immaterial" implies that a court has reached not just the allegation's factual basis, but also "the overall merits of an ineffective assistance claim to decline appointing new counsel for further hearing." *Roddis*, 2020 IL 124352, ¶ 64. Here, we do not know if the trial court found defendant's allegation legally immaterial because it was not amenable to satisfaction of the deficiency prong of *Strickland*, the prejudice prong, or both. Thus, we will analyze defendant's allegation under both prongs, beginning with deficiency.

¶ 38　　　　Taking defendant's allegation as true, which, again, is necessary for it to be deemed legally immaterial, he informed counsel that A.R.—who was one of only four State witnesses and the only witness to provide direct evidence of the alleged abuse—"couldn't be trusted, that she wasn't credible." He indicated "how she constantly fabricated stories." He also informed counsel of where to find evidence that could be used to impeach her credibility: in DCFS records, psychiatric records, and police reports. Counsel did not indicate that he attempted to investigate the existence of the alleged documents, nor did he offer an explanation as to why such an investigation would have been unnecessary. Instead, he merely stated that he tried to "test her credibility" on cross-examination. If indeed defendant notified counsel of the existence of potentially useful evidence to impeach a key State's witness, a failure by counsel to investigate could be considered unreasonable performance. See, *e.g.*, *Domagala*, 2013 IL 113688, ¶ 38 ("Trial counsel has a professional duty to conduct reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (Internal quotation marks omitted.)); see also *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005) ("An attorney who

fails to conduct reasonable investigation *** cannot be found to have made decisions based on valid trial strategy."). Thus, defendant's allegation, if ultimately proven to be true, could satisfy the deficiency prong of *Strickland*.

¶ 39 Similarly, we find defendant's allegation could also satisfy the prejudice prong. Given the circumstances, the trial court had no way of knowing if the alleged documents existed, let alone whether they contained evidence which could have possibly changed the outcome of the trial. See *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (explaining the impossibility of determining whether confidential records contained material evidence when the court had not viewed the records). It is conceivable the alleged records contained evidence that the victim had made false accusations in the past or evidence of her mental-health history that could be used to impeach her credibility. See, *e.g.*, *People v. Hogan*, 388 Ill. App. 3d 885, 896 (2009) ("The mental-health history of a witness is relevant as it relates to her credibility and it is a permissible area on impeachment."). Thus, it would have been manifest error for the trial court to conclude that the factual basis of defendant's allegation was insufficient to establish either the deficiency prong or the prejudice prong of *Strickland*. Accordingly, the allegation was not "legally immaterial."

¶ 40 Defendant's allegation of ineffective assistance described above and counsel's response show possible neglect of the case. Although the State's evidence was sufficient to convict defendant of the offenses charged, it was by no means overwhelming. This case boiled down to a credibility contest, with A.R. as the key State's witness. Accordingly, defendant's allegation that counsel failed to investigate A.R.'s credibility demonstrated possible neglect of the case. New counsel should have been appointed to investigate defendant's claim of ineffective assistance of trial counsel. *Jackson*, 2020 IL 124112, ¶ 97.

¶ 41    Having found that remand is necessary for the appointment of new counsel, we do not address the other issue defendant has raised on appeal. See *People v. Bell*, 2018 IL App (4th) 151016, ¶¶ 24, 37 (declining to address the defendant's remaining arguments where the cause first had to be remanded for the trial court to conduct a preliminary *Krankel* inquiry). However, as we did in defendant's initial appeal, we retain jurisdiction over this remaining claim, meaning he may again appeal if he is dissatisfied with the proceedings on remand and raise the unaddressed claim. *Byrd*, 2023 IL App (4th) 220894, ¶ 20.

¶ 42             III. CONCLUSION

¶ 43    For the reasons stated, we reverse the trial court's judgment and remand for the court to appoint new counsel to independently evaluate defendant's *pro se* claims of ineffective assistance and, if counsel determines any of them have potential merit, represent defendant at the hearing on those claims.

¶ 44    Reversed and remanded with directions.