2024 IL App (1st) 230663-U

No. 1-23-0663

Order filed December 18, 2024

THIRD DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | No. 19 CR 02548 |
| v. | ) ) | Honorable Brian Flaherty, |
| PERRY GOSA, | ) ) | Judge Presiding. |
| Defendant-Appellant. | ) ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's decision to decline to appoint counsel to investigate defendant's claims of ineffective assistance of trial counsel after a preliminary *Krankel* hearing was not manifestly erroneous.

¶ 2    Defendant Perry Gosa appeals his conviction for first degree murder and attempted murder in the shooting death of Michael Carney (Michael). Following his conviction after a jury trial, defendant was sentenced to 70 years' incarceration. In a *pro se* posttrial motion for a new trial, defendant alleged that his trial counsel was ineffective. The trial court held a

preliminary *Krankel* hearing and, after hearing defendant and defense counsel's arguments, declined to appoint counsel to further investigate defendant's claims. Defendant appeals, arguing that the trial court's decision to not appoint counsel to investigate his *Krankel* claims constituted reversible error.

¶ 3                                          I. BACKGROUND

¶ 4        On October 21, 2018, Michael was shot and killed in a vehicle in Harvey, Illinois. His girlfriend, Lameice Shelton (Lameice), to whom the vehicle belonged, and his daughter, Makayla Carney (Makayla), were in the vehicle with Michael when he was shot. Defendant turned himself in on November 13, 2018, after learning that there was a warrant for his arrest. Defendant was charged with first degree murder and attempted murder. Defendant was initially represented in pretrial proceedings by attorney Edward Edens, who filed several motions. Defendant then hired John Paul Carroll (Carroll) and Michelle Gonzalez (Gonzalez) to represent him.

¶ 5                                      A. Prosecution Witnesses

¶ 6        At trial, Lameice testified that she was 29 years old and had known defendant since sixth or seventh grade. She was in a relationship with defendant "on and off" and entered into a serious relationship around the age of 15. The two continued to date through sometime in 2016 and, during that time, had a son, Lamanii, who was 10 at the time of the events of this case. After the two broke up, the informally established routine with Lamanii was that defendant would have him on weekends and Lameice would have him during the week. In 2017, Lameice began to date Michael.

¶ 7        On Sunday, October 21, 2018, around 3:00 p.m., Lameice was riding in her Chevrolet Equinox, with which defendant was familiar from times when Lameice had dropped off their

son with him. Michael was driving and Makayla was in the rear passenger seat. Lameice and defendant had agreed that defendant would drop Lamanii off with Lameice's grandparents in Robbins, Illinois so that Lameice could pick him up and take him and Makayla to a Halloween party in Indiana while Michael watched football.

¶ 8    While the three were parked at a Shell station at the intersection of 159th Street and Dixie Highway, Lameice received a call from Lamanii's phone. This was not abnormal, as Lameice and defendant had one another's numbers blocked in their respective phones, so communication regarding drop-offs usually went through Lamanii's phone. Lamanii stated that he would be dropped off soon. Ten minutes later, he called and reported that he had been dropped off at the home of Lameice's other set of grandparents in Harvey, Illinois, which was only a two or three minute drive away from the Shell station. Michael pulled out from the Shell station and proceeded north on Dixie Highway. Lameice recalled that he stopped at a red light next to a GoLo gas station, though she could not remember the cross street. While the car was stopped at the light, Lameice heard "pipes," which was the term she used to refer to the noisy custom exhaust pipes that defendant had installed on his black Chevrolet Monte Carlo. Lameice stated that the noise was distinctive, and she could recognize it. Soon after hearing the pipes, defendant pulled up next to Lameice's car on the passenger side. She recognized his vehicle not only because of the sound it made, but because of its black-tinted windows.

¶ 9    Defendant rolled down his window and "gave [Michael and Lameice] a real nasty look and mumbled some words and he was finicking [*sic*] with his hoody" "like he was trying to pull something out of it" with his left hand. Lameice believed that defendant was going to pull a gun, so she "just started screaming go." She did not see a gun at that time. Michael

proceeded down Dixie Highway at an unspecified speed in excess of the speed limit. Defendant kept pace to the car's right. Eventually Michael got in front of defendant and made a right turn onto 147th Street and "went down a little while and then *** turned into a Marathon gas station to lose him." Defendant turned into the second entrance to the gas station and followed, despite Michael's efforts to evade him. Michael turned right, back out onto 147th, after looping through the Marathon parking lot, and continued to speed.

¶ 10        Lameice testified that around the time their car reached the intersection of 147th and Cooper Avenue, she "asked [Michael] was [defendant] gone and [Michael] said no. We had a conversation, and [defendant] was blocked on my phone, so I tried to dial star 67 to get his number out to tell him [Michael's] daughter is in the back seat. Before I knew it, my window was blown out." Lameice heard a gunshot and turned to reach back and "get [Makayla] down" before looking to her right. Out the passenger side window, she saw defendant's car within arm's reach with defendant alone in his car, holding a gun in his hand. She did not see the second shot being fired but testified that she believed two shots were fired. She screamed at Michael to go, unaware that he had been shot in the head. Defendant sped away from the scene. Michael subsequently died.

¶ 11        Lameice brought the car to a stop before getting both herself and Makayla out of the vehicle. Police arrived shortly thereafter, and she informed them that defendant was the shooter and described his car to them. Lameice stated: "They were trying to question me, but I was in a frantic [*sic*] because they wasn't doing any CPR or anything on him, so I really wasn't there physically, mentally there. I was just screaming." Lameice left the scene with police and went to the Harvey Police Department. There, she was interviewed and provided police with defendant's phone number.

¶ 12      When questioned regarding video tape recovered from the Marathon gas station, she agreed that that video accurately portrayed the chase that occurred. When questioned about what she saw in the video, she stated that the car she identified as defendant's had both windows open, the sunroof cracked partway open, and black rims on the tires. The photographs taken of defendant's car by an officer after it was recovered also show black rims and the sunroof cracked partway open.

¶ 13      On cross-examination, defense counsel walked Lameice through much of the same testimony, verifying various details. When asked if she could understand any of what defendant mumbled when he first pulled up next to Lameice's car, she stated that she could not. She stated that she did not see him with a gun at that time. Defense counsel questioned why, in the process of this chase, Michael drove past the Harvey Police Department and did not turn and stop there for safety. Lameice stated that defendant was to their right, so they could not make a right turn. When asked why Michael did not simply brake and turn behind defendant, Lameice stated that "the chase had already started." Lameice also stated that she did not call 911 during the chase.

¶ 14      When asked on cross-examination whether she told Detective Moore on the scene that defendant said "I should off your ass right now" at the intersection with the GoLo gas station, Lameice stated "I don't recall, but I did." When asked for clarification, she stated that she "did tell him he mumbled something out of his mouth. I don't recall at this time exactly what it was." When pressed on whether she understood the words defendant had mumbled, Lameice stated "I don't recall." Regarding whether defendant showed a gun when he made that mumbled statement, the following lengthy exchange took place:

"Q. Do you recall telling the detective at the point he rolled down the window, not the detective, but [defendant], that [defendant] displayed a gun?

A. I did not.

Q. Did you tell the detective that?

A. I did not.

Q. You don't recall or you didn't say it?

A. I don't recall.

Q. Do you recall telling him that it was a black handgun?

A. I don't recall. I did not say black.

* * *

Q. Do you recall telling [an assistant state's attorney and two detectives], Detective Rife specifically, that it was a black handgun that [defendant] had showed you or displayed as you were stopping at the GoLo station?

A. I do not recall.

Q. Are you saying you don't recall?

A. I said I don't recall.

Q. As you viewed that video from the Marathon, you never saw [defendant] on 147th Street, did you?

A. I did.

Q. Do you recall testifying before the grand jury?

A. Yes.

Q. On October 23, 2018?

A. I do.

***

Q. Do you recall this question being asked of you and they're talking about him at the – your interaction at the GoLo gas station. Question: Okay, but you never saw a gun at this time, correct? Your answer: No, I didn't see, like, he was trying to pull something out." Do you recall that question?

A. I do.

***

Q. Did you see a gun at the [GoLo] intersection (background courtroom noise) [defendant]?

A. Not at that point.

Q. When is the first time you saw [defendant] with a gun on the 21st of October?

A. After the first shot was fired before the second.

Q. So that would be when you are at 147th Street at the intersection of Cooper, is that correct?

A. Correct.

***

Q. Could you tell the jury what color the gun was?

A. The gun was silver.

***

Q. Have you ever told a policeman, a state's attorney, a grand jury that you saw [defendant] with a gun between the first and second shot?

7

A. I told them when they asked. Nobody had asked me up until Monday when I came.

Q. Here's my question. Did you tell anybody that you saw [defendant] with a gun between the first shot and the second shot?

A. Yes.

Q. Could you tell us who you told?

A. I told Bill.

Q. You mean the state's attorney?

A. Yes.

Q. Is he the first person you told that to?

A. He is the first person that asked, yes.

* * *

Q. You never told the detective and the state's attorney at the police station and you never told the grand jury that you had seen [defendant] with a gun in his hand, isn't that correct?

A. They never asked.

Q. Isn't that correct?

***

A. That's correct.

Q. You never volunteered that information, is that correct?

A. That's correct.

Q. When you're in front of the grand jury the state's attorney said to you: All right, ma'am, is there anything else important that I didn't ask you that you wanted to add regarding this incident, and your response was no. Do you recall that?

A. I do."

¶ 15     Lameice agreed that she told Detective Rife and the assistant state's attorney that, as Michael went through the red light next to the GoLo gas station, she expressed concern that they would get a ticket in the mail for running the light. Lameice agreed that she spoke briefly with defendant after Lamanii told her where he had been dropped off, and that there were no harsh words between them during that brief conversation. Lameice confirmed that when prompted to tell the grand jury "at what point did you see the black Monte Carlo on 147th before the shots," she answered "I didn't. He was in my blind spot." Lameice agreed that after the shooting and her turning to protect Makayla, she turned back and saw defendant's car leaving, but did not see a license plate number or any damage on the car. On re-cross examination, defense counsel again inquired about the color of the handgun and Lameice stated that although she did not recall who she told, she said it was silver.

¶ 16     Lameice's grandfather, John Shelton, testified that on the afternoon of the shooting, "probably about 3 or something like that," Lamanii arrived unannounced with defendant. Defendant gave Lamanii's backpack to John and left. Lamanii stayed. John testified that he did not know how long it would take to get from his home to the intersection of 159th and Dixie Highway, but that it would be "[a] hop, skip and a jump."

¶ 17     Officer Elijah Muhammad testified that he was called to the scene of the shooting and subsequently collected camera footage from the Marathon gas station.

¶ 18      Sergeant David Gryczewski testified that on October 21, 2018, he was assigned to check for an "older model dark Chevrolet" and was provided defendant's address as the address of a possible suspect to check for the vehicle. After heading to that address, Gryczewski was informed that Officer Vander Kam had located the vehicle in question one block due east of the address Gryzewski had been given. Gryczewski and the two other officers present secured the scene and received the information that the car they had located was registered to defendant at the address Gryczewski had originally been given. He returned to that address, knocked on the door, and called the number on file for the residence, but received no answer. He then left the scene.

¶ 19      Officer Robert Wright testified that, on October 21, 2018, he was asked to recover a vehicle. Wright proceeded to the location where defendant's Monte Carlo had been located and took pictures of the vehicle. He testified that in those pictures, the sunroof on the car is cracked open and there were minor scratches and possibly a small dent on the front of the vehicle.

¶ 20      Various experts testified regarding the physical evidence, including autopsy evidence showing that Michael died by gunshot to the head, crime scene evidence regarding two shell casings recovered, and the bullet recovered from Michael's body, which was of a matching caliber. Defendant's vehicle was tested for gunshot residue and that test produced a negative result. The parties stipulated that there was a letter in the glovebox addressed to defendant with a date written on it that was five days before the shooting. Another officer testified that no reports were made from October 21, 2018 through November 13, 2018 of a 2004 Monte Carlo like defendant's going missing.

¶ 21        Special Agent Matthew Windisch of the Illinois State Police testified regarding the cellphone data collected in this case. Agent Windisch examined data related to a cellphone number that was registered under defendant's mother's name and that Lameice testified was defendant's phone number at the time of the shooting. The recovered data indicated that defendant's cell phone pinged cell phone towers at times and locations that matched defendant's purported movements according to Lameice's testimony. The officer stated that the data was open to interpretation, as phones might switch overlapping towers due to signal traffic rather than physical movement in space, and because the signal radiuses of the various towers were estimates based upon their strength and the height at which they were mounted.

¶ 22        Detective Rife testified that he was assigned to attempt to find defendant after the shooting, but was unsuccessful. On November 13, 2018, defendant turned himself in. Rife also testified that he attempted to recover video from another business with a camera that might have relevant footage, Restoration Ministries, but later discovered that the transfer had been unsuccessful and the file was corrupted. By the time he discovered the error, the original footage at Restoration Ministries had already been taped over.

¶ 23        The State called Antwain Morton (Morton), who testified that, at the time of the shooting, he was living at the address from which the black Monte Carlo was recovered. He was friends with defendant, who lived about a block down the street from him, but had only known him for a year and a half or so at the time of the shooting. They both belonged to the same car club and would sometimes talk on the phone. On the afternoon of October 21, 2018, Morton received a call from defendant, who asked him to "put the car up." Two minutes later, defendant's sister, whom Morton had met before, arrived in front of his house in defendant's car. She handed the keys to the car to Morton, then got in a red car with someone

else and left. Morton pulled the Monte Carlo into his driveway. About 15-20 minutes later, police officers arrived, Morton told them what had happened, and the police towed the car. On cross-examination, defense counsel asked only whether Morton informed the police of what had occurred because he knew his fingerprints would be on the door and steering wheel of the vehicle. Morton agreed with that assessment.

¶ 24                                    B. Defense Witnesses

¶ 25        Defendant called witness Grace Shan, who was the manager of Restoration Ministries at the time of the shooting. On October 26, 2018, five days after the shooting, police came into the store and asked to access the store's video surveillance from October 21, 2018. Grace helped the officers go through the video and stated that there "were certain parts where they need [*sic*] me to slow down or speed up to try to figure out who was who and what was going on." She recalled one officer pointing out a black SUV and asking whose car it was. Grace did not recall whether the officers ever indicated which vehicle belonged to the suspected shooter, nor did she recall any other specifics of why the officers pointed out the black SUV. On cross-examination, when asked if the officers were interested in one particular car, Grace responded: "No, they were looking at several cars. There was a couple at a time. They were all racing down the street." Grace testified that the officers never mentioned a white SUV or a black car, she just remembered, from three and a half years prior, an officer pointing out a black SUV at some point during their examination of the video.

¶ 26        Defendant called Officer Derrick Moore, who was called to the scene of the shooting and spoke to Lameice immediately following the shooting. Officer Moore testified that Lameice told him that defendant told her "I should off y'all ass right now" and displayed a black handgun after pulling up next to her vehicle next to the GoLo station. He also stated that

12

Lameice told him she saw defendant shoot twice when he was again parallel to her vehicle at 147th and Cooper. On cross-examination, Officer Moore stated that his interview with Lameice occurred over approximately five to ten minutes, during which time Michael had not yet been removed from the vehicle, paramedics were still on the way, Lameice was holding a crying child, and Lameice was upset. When asked whether Lameice was talking fast or slow, Officer Moore responded: "She wasn't calm. I will say that." Officer Moore also confirmed that he had subsequently resigned from the department and had been federally indicted for drafting a fraudulent police report in an unrelated case.

¶ 27     After closing arguments and deliberation, the jury returned a verdict finding defendant guilty of first degree murder and attempted first degree murder.

¶ 28                              C. Posttrial Motions

¶ 29     On May 11, 2022, defense counsel filed a motion for a new trial. In that motion, defendant argued that (1) Lameice's testimony that she saw defendant at the scene of the shooting and that she saw him with a gun was a complete surprise to the defense and the State's failure to disclose the fact that Lameice was planning to testify to that effect was a *Brady* violation; and (2) that the State had committed "reversible error" by (a) failing to disclose that Morton was a possible witness, as defendant had no opportunity to interview Morton and prepare for his testimony; (b) interviewing Morton and failing to relay the content of his planned testimony to the defense; (c) failing to disclose Lameice's new ID card, which contained her signature; (d) submitting video and cell phone records to be published to the jury without testimony from the keeper of the records; (e) asking the Notary Public witness "speculative questions which had nothing to do with her common practices, intending to mislead the jury into improper speculation;" and (f) improperly arguing that

fingerprints on the expended shell casings had been obliterated when there was no evidence to support that assertion."

¶ 30    On March 9, 2023, after a number of continuances on posttrial motions and sentencing, defendant filed a *pro se* "Motion for New Trial Based on *Krankel* Hearing." In that motion, he argued that trial counsel was ineffective for (1) failing to timely object to those issues raised in the May 11, 2022 motion for a new trial, (2) failing to "make any effort to interview or otherwise investigate [Morton], despite knowing that [Morton] was in possession of defendant's car after the crime occurred," and (3) failing to properly impeach Lameice's testimony. Defendant also raised a number of issues unrelated to ineffective assistance of counsel and irrelevant to his request for a *Krankel* hearing and to our *Krankel* analysis.

¶ 31    On March 15, 2023, the court held a *Krankel* hearing on defendant's *pro se* motion for a new trial. Carroll was unable to be present for the *Krankel* hearing, as he had recently had surgery, but Gonzalez was present. When asked about defendant's contention that counsel had not investigated or interviewed Morton, Gonzalez responded that as far as defense counsel was aware, Morton was out of state in Indiana, and the State was not planning to call him as a witness. However, once the State decided to call him as a witness, defense counsel "did go into a room and speak with him," but was "still not informed that he was going to say that [defendant] called him and said put up the car. We never received that information from the State or the witness."

¶ 32    After going through defendant's various allegations, the trial court stated:

"I think the evidence against you was so overwhelming that whether or not Ms. Gonzalez or Mr. Carroll interview[ed] [Morton], it doesn't make a difference. The evidence was what the evidence was. I think your attorneys did a very commendable

14

job, considering the evidence that they had, that there was no error, that even if there was some error, the error was certainly not even strong enough to get past any prong regarding ineffective assistance of counsel.

So your motion for a *Krankel* – for an attorney to be appointed to represent you on the motion for ineffective assistance of counsel will be denied."

¶ 33     On March 27, 2023, the trial court held a hearing on the motion for a new trial filed by defense counsel. The trial court stated that the matters raised were all matters the court ruled on during trial. The trial court concluded with the statement: "I think the evidence against the defendant was overwhelming. I think the defendant committed this crime. So your motion for a new trial is denied." Sentencing then commenced during the same hearing and defendant was sentenced to a total term of 70 years' incarceration with the Illinois Department of Corrections. Defendant subsequently filed this timely appeal.

¶ 34                                II. ANALYSIS

¶ 35     On appeal, defendant asserts that the trial court erred in declining to appoint counsel to further investigate defendant's claims of ineffective assistance of counsel after a preliminary *Krankel* hearing. Defendant argues that the trial court's decision not to appoint counsel was manifestly erroneous not only with regard to those issues defendant raised in his *pro se* motion for a new trial below, but also with regard to numerous other matters that defendant believes the trial court should have considered *sua sponte* to be indicative of ineffective assistance of counsel.

¶ 36     "A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed by [our supreme court] in *Krankel* and refined by its progeny." (Internal citation omitted.) *People v. Roddis*, 2020 IL 124352, ¶ 34 (citing *People*

*v. Krankel*, 102 Ill. 2d 181 (1984) and *People v. Ayres*, 2017 IL 120071, ¶ 1). Under the procedure established in *Krankel*, "[n]ew counsel is not automatically appointed in every case when a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. Rather, when a defendant makes such a claim, the court should first examine the facual basis of defendant's claim." *Id.* "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.* The trial court may consider the allegations' factual and legal merits in deciding whether to appoint counsel. *Id.*, ¶¶ 61, 70. We will only reverse a trial court's determination on the merits of a defendant's *Krankel* motion if the trial court's decision was manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98.

¶ 37 Illinois adheres to the same two-prong test for ineffective assistance of counsel laid out in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984)). Under *Strickland*, a defendant must prove that (1) trial counsel's representation fell below an objective standard of reasonableness and that (2) absent these errors, there was a reasonable possibility that the result of the trial would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36. In order to prevail, defendant's claim must satisfy both prongs. *Colon*, 225 Ill. 2d at 135.

¶ 38                                    A. New Arguments On Appeal

¶ 39 On appeal, defendant raises numerous new claims indicating particular acts or omissions on the part of trial counsel that he claims are sufficiently indicative of neglect to render the trial court's decision manifestly erroneous. "[T]he general rule is that where a question is not raised or reserved in the trial court *** it will not be considered and will be deemed to have

been waived." *People v. Burson*, 11 Ill. 2d 360, 370 (1957). Defendant asserts in his opening brief that "[b]ecause trial courts are permitted to rely on their observation of trial counsel when determining whether to appoint counsel, these claims were also available for the trial court to review." Defendant provided no legal citation for this assertion in his opening brief, but belatedly provided one in his reply brief, where he cites to *Moore*, which states that "the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial." *People v. Moore*, 207 Ill. 2d 68, 79 (2003) (citing *People v. Towns*, 174 Ill. 2d 453, 466 (1996); *People v. Williams*, 147 Ill. 2d 173, 252-53 (1991)).

¶ 40     The language that defendant himself cites refers to the trial court's "evaluation of the defendant's *pro se allegations* of ineffective assistance." (emphasis added) *Id*. Even if, in *Moore*, our supreme court had meant to refer to a legal claim that trial counsel was ineffective when it used the word "allegations," there would have been no need to pluralize the word, as the claim that counsel was ineffective is a single legal claim that can be supported with factual allegations. As such, even without further analysis, both the word choice and the syntax of the chosen language makes clear that *Moore* is referencing the specific factual allegations made by a defendant. The portion of *Towns* cited in *Moore* for the relevant proposition states that "to determine whether new counsel should be appointed, the circuit court should examine the *factual matters underlying defendant's claims* and, if the claim lacks merit or pertains to matters of trial strategy, new counsel need not be appointed." (emphasis added) *Towns*, 174 Ill. 2d at 466. This further demonstrates that our supreme court's intent was to permit the trial court to utilize its personal knowledge of counsel's performance to provide relevant context to the factual allegations laid out before it by the

defendant to assist it in determining whether a claim of ineffective assistance has potential merit. As such, those factual allegations that were not raised by defendant in his posttrial motion, but were raisedin support of his ineffective assistance claim on appeal are waived.

¶ 41                                    B. Defendant's Arguments at Trial

¶ 42      Defendant's *Krankel* motion for a new trial raised three cognizable allegations of ineffective assistance of counsel, putting aside the assertions that defendant made in that motion that were inappropriate for a *Krankel* motion. First, defendant alleged ineffective assistance of counsel "due to trial counsel[']s failure to object during trial to all the issues raised in counsel[']s post trial motion for a New Trial." Second, defendant alleged that trial counsel was ineffective for failing to "interview or otherwise investigate [Morton], despite knowing [Morton] was in possession of [defendant's] car after the crime occurred." Lastly, defendant alleged that trial counsel was ineffective for "[f]ailure to object to the testimony of Lameice Shelton where she testified contrary to the original statements," which we interpret, in context, to be an assertion that trial counsel failed to adequately impeach Lameice's testimony.

¶ 43                      1. Failure to Object Prior to Posttrial Motion for a New Trial

¶ 44      Defendant stated, without further specificity, that trial counsel was ineffective for failing to timely object at trial to those matters raised in the May 11, 2022 motion for a new trial. On appeal, defendant makes no argument that trial counsel's failure to object to various alleged errors at trial rendered those objections untimely and thereby prejudiced defendant. Instead, defendant argues that the errors that defense counsel chose to allege in its motion for a new trial, indicated neglect, a lack of preparation, and a failure to review the record on the part of defense counsel. Defendant draws particular attention to defense counsel's claim that the

18

State failed to tender various pieces of evidence that the State maintains it did, in fact, tender. Although the trial court was aware of these circumstances that could be interpreted as lack of preparation or neglect, such lack of preparation was not an issue highlighted by defendant in his *pro se* motion and so was not raised below. As such, this argument is forfeited on appeal. *People v. Cruz*, 2013 IL 113399, ¶ 20 ("Generally, an issue not raised in the trial court is forfeited on appeal."). If we were to consider the argument defendant made below, then the result would be the same: defendant has not cited any rule, statute, or case law to assert that defense counsel's failure to object to the matters in their motion for a new trial prior to that motion led to any prejudice whatsoever. Accordingly, the argument would be waived on appeal for lack of citation to authority to support it. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument in appellate brief must be supported by citation); *People v. Ward,* 215 Ill. 2d 317, 332 (2005); In re *Marriage of Bates,* 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited"); *Rosier v. Cascade Mountain, Inc.,* 367 Ill. App. 3d 559, 568 (2006) (holding that, by failing to offer any supporting legal authority or reasoning, plaintiffs waived consideration of their theory for asserting personal jurisdiction over defendants).

¶ 45                    2. Failure to Interview or Investigate Antwain Morton

¶ 46        Defendant's second allegation is that defense counsel was ineffective because they failed to interview or otherwise investigate witness Antwain Morton. In their motion for a new trial, defense counsel claimed that the State did not inform them that Morton was going to be called as a witness. This claim is belied by the fact that Morton was listed as a potential witness in the State's answer to discovery.

19

¶ 47        Defense counsel asserted that they were never informed that the State had located and interviewed Morton, and that they had not been apprised of the contents of those interviews. The State argued that Morton's testimony was in line with what he told police and was therefore contained in the police reports in the record. Therefore, none of it was a surprise. Defense counsel responded that, at a minimum, they had never been informed, through such police reports, or any other production of evidence, that Morton was allegedly called by defendant in the immediate aftermath of the shooting and told to "put up the car."

¶ 48        Although defendant asserts in this appeal that the State was correct and the content of Morton's testimony was reflected in a police report that was tendered to the defense in open court, the only thing that defendant cites in support is the State's in-court assertion to that end. The record contains no such police report. In fact, the only mention of Morton in the record prior to trial is in the State's answer to discovery, where he is listed as a potential witness. "[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); see also *People v. Bonilla*, 2018 IL 122484, ¶ 9 (applying *Foutch* in a criminal case). Accordingly, we will disregard that portion of defendant's argument that relies upon the police report that is missing from the record and presume that the trial court had sufficient basis for its decision with regard to that particular claim.

¶ 49        All we do know regarding defense counsel's knowledge of Morton is that, at the start of trial, they were aware that the vehicle was found at his home, as they drew attention to this

20

fact and painted Morton as a potential alternative suspect in their opening statement. Despite this fact, defense counsel did not interview Morton or investigate him any further. Even if we accept that there is no strategic justification for defense counsel's failure to interview Morton, defendant makes virtually no argument on appeal as to how this failure prejudiced defendant. Defendant asserts that he "need not establish that he was actually prejudiced by his attorneys' conduct; instead, he need only meet the lesser standard that there was possible neglect of his case." Defendant cites to *Roddis* for this proposition, but the cited passage criticizes the trial court judge only for using "a few misnomers" to describe its decision. *Roddis*, 2020 IL 124352, ¶ 67. As we have already discussed above, the holding of *Roddis* explicitly states: "we hold that a trial court may consider both the facts *and legal merits* of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel at the preliminary inquiry stage." (emphasis added) *Id.*, ¶ 70. The trial court in this case stated, as it denied defendant's *pro se Krankel* motion: "I think the evidence against you was so overwhelming that whether or not Ms. Gonzalez or Mr. Carroll interview[ed] [Morton], it doesn't make a difference. The evidence was what the evidence was." Although the trial court did not used the word "prejudice" in that statement, it is clear that the trial court's judgment was based in part on a belief that no prejudice could be shown.

¶ 50    At the close of his opening brief, defendant very minimally addresses prejudice by first stating the conclusion that defendant was prejudiced, because there is a reasonable probability that the outcome would have been different but for defense counsel's performance and then offering this court a paragraph of open-ended questions and what-ifs. Most of that paragraph is dedicated to potential prejudice from issues that are not properly before this court. None of it concerns the failure to interview Morton except, perhaps,

defendant's repeated assertion that defense counsel's actions make clear that they had not reviewed the record thoroughly. If we accept that as true and agree, for the sake of argument, that defense counsel completely overlooked Morton until the day he arrived in the courtroom to testify at trial, defendant has still not established prejudice. Not only did defense counsel take the opportunity to interview Morton once he was in court, but his testimony does not suggest that, had defense counsel interviewed him earlier, the outcome of the trial would have likely changed. Morton testified that he was home on the afternoon that the shooting occurred, that defendant called him to "put up" defendant's car, and that he was unfamiliar with both Lameice and Michael. Thus, while defense counsel may have erred in failing to investigate or interview Morton, we see no apparent prejudice from these errors. Therefore, we cannot say that the trial court's decision not to appoint counsel was manifest error. Although we do find some facets of trial counsel's representation to be concerning, our consternation has no legal effect in the absence of a showing of prejudice from defendant.

¶ 51          3. Failure to Adequately Impeach the Testimony of Lameice Shelton

¶ 52     In his *Krankel* motion, defendant asserted (1) that defense counsel failed to "object to the testimony of Lameice Shelton where she testified contrary to the original statements, as evidenced by trial counsel[']s motion for a New Trial (issue #1)" and (2) that Lameice's trial testimony differed from her grand jury testimony and defense counsel failed to adequately use that variance to impeach Lameice.

¶ 53     On appeal, defendant seems to have largely abandoned this argument. While defendant does argue defense counsel demonstrated an ignorance of the fact that Lameice had allegedly related to Officer Moore at the scene that she had seen defendant holding a gun near the GoLo station, and that the police report generated from that interview was in the record and

22

reflects as much, that police report is not in the record on appeal. That said, defense counsel referred to the fact that Lameice told Officer Moore that she saw defendant fire the gun in their opening statement. This could be because the opening statement was delivered by Carroll, while the assertion that defense counsel was never informed that Lameice was changing her testimony came from Gonzalez. Alternatively, it may be that Gonzalez was asserting that the defense should have been informed of the change in planned testimony whether the factual information in that new testimony was already in the record or not. Regardless of which interpretation of events prevails, to the degree that defendant's theory of the case is that his attorneys were not sufficiently familiar with the record, he has failed to show any prejudice that resulted.

¶ 54    Defendant's claim that trial counsel did not sufficiently impeach Lameice is unsupported by the record. On cross-examination, defense counsel pointed out the difference in Lameice's testimony and what she told Officer Moore on the scene immediately after the shooting. Defense counsel also questioned Lameice about her testimony that she saw defendant with a gun in his hand between the first and second gunshots but that she did not volunteer this information to either the police questioning her after the shooting, nor to the grand jury. Defense counsel further questioned Lameice regarding her grand jury testimony and questioned the logic of her version of events. Whatever faults defendant may see in defense counsel's attempts to impeach Lameice, the standard is not perfection and we see no support in the record for the assertion that they either failed to impeach Lameice's testimony or failed to utilize important impeaching evidence. Accordingly, we cannot say it was manifest error for the trial court to decline to appoint counsel to investigate defendant's *Krankel* claim.

¶ 55                                   III. CONCLUSION

¶ 56        Defendant raises numerous *Krankel* allegations on appeal, but most are not properly before us, as they were not raised below. In arguing those that are properly before us, defendant appears to have misinterpreted the legal standard and has largely failed to establish a plausible case for prejudice resulting from his trial counsel's alleged errors. As such, we cannot say that the trial court's decision to not appoint counsel to investigate defendant's *Krankel* claims was manifestly erroneous.

¶ 57        For the foregoing reasons, we affirm the trial court's order.

¶ 58        Affirmed.